**DELAWARE VALLEY AUTOMOBILES, INC.**

**v.**

**GENERAL MOTORS CORPORATION.**

**C.A. No. 72–1931.**

United States District Court, E. D. Pennsylvania.

April 3, 1974.

J. Earl Epstein, Harris T. Bock, Verlin, Goldberg & Epstein, Philadelphia, Pa., for plaintiff.

Edward J. David, Liebert, Short, FitzPatrick & Lavin, Philadelphia, Pa., for defendant.

## OPINION AND ORDER

JOSEPH S. LORD, III, Chief Judge.

This is an action to recover excise taxes.

On August 15, 1971, President Nixon announced that in order to stimulate the economy, he was requesting that Congress repeal the 7% excise tax then extant on new passenger cars retroactive to the date of the announcement. General Motors thereafter apprised the public that if such legislation was passed, a refund in the amount of the tax would be passed on to all persons who bought new General Motors vehicles after August 15, 1971.

Plaintiff ("Delaware Valley") is a non-franchised dealer engaged primarily in the sale of new and used Cadillacs (which are, of course, manufactured by General Motors). Plaintiff acquires its stock from various sources including General Motors franchised dealers and car auctions. According to the general manager and vice president of Delaware Valley, Jerry Friedrich, General Motors franchised dealers will not openly sell to Delaware Valley. Sales, therefore, are consummated by passing title either to Sindell Leasing Co., a fictitious name of

Delaware Valley, or to a member of its president's family. Mr. Marvin Yentis, president of Delaware Valley, and Mr. Friedrich both testified that these were nonetheless "new" cars when passed on to plaintiff's customers.

### The "Consumer Purchase" Vehicles

Count I of plaintiff's complaint involves twenty-seven Cadillacs acquired by Delaware Valley before August 16, 1971 and sold to its customers after that date and before December 10, 1971.

After the President's announcement on August 15, there apparently was general confusion among dealers as to what action, if any, should be taken. Mr. Yentis testified that after making several inquiries and receiving no clarification, he acted on the advice of counsel and began to give credits to customers in the amount of the excise tax if the customer refused otherwise to purchase a vehicle.[1] Mr. Yentis asserted that this was necessary in order to maintain plaintiff's competitive position.

Plaintiff's procedure for making a refund was as follows. A price would first be agreed upon, along with a bargained discount and/or trade-in. Then the amount of the excise tax would be determined and a credit would be given against the net purchase price. The customer acknowledged receipt of the tax credit by signing an appropriate statement.

On December 10, 1971, the Revenue Act of 1971, P.L. 92–178, 85 Stat. 497 (hereinafter "Act"), was signed into law. Section 401 of the Act provided for the elimination of the federal excise tax on passenger cars and a refund of such tax on new passenger cars delivered after August 15, 1971. This refund was to be made by the manufacturer to the consumer or "ultimate purchaser" first, and only then could the manu-facturer apply to the Internal Revenue Service for a refund.

Consequently, General Motors went about making refunds by referring to its new car delivery report cards. These cards named the party who purchased a new General Motors automobile from a General Motors franchised dealer. General Motors sent notification to these purchasers of their entitlement to a refund. In the case of plaintiff, since the first sale, the one by the General Motors franchised dealer to Sindell Leasing, or to a member of Marvin Yentis' family, or to some other purchaser, each of whom eventually passed the car on to Delaware Valley for resale, occurred before August 16 in each of the twenty-seven cases, General Motors did not recognize these as coming within the ambit of the 1971 Revenue Act.

After Delaware Valley brought these cars to the attention of General Motors in April of 1972, General Motors still refused to make refunds on the grounds that (1) Delaware Valley's customers were not "ultimate purchasers" of "new" cars under the Act; and (2) even were that not the case, Delaware Valley had failed to comply with the refund procedure later articulated in the Temporary Excise Tax Regulations, § 142.-2–2(b)(4), issued on May 17, 1972. These regulations provide that a refund was to be made by separate check, and could not merely be in the form of a discount or credit against the purchase price.

Plaintiff argues that defendant has breached a duty to it and has violated the requirements and the spirit of the Act by failing to process plaintiff's claim for a refund. Furthermore, plaintiff claims that defendant cannot take it upon itself to make ultimate legal decisions as to who is and who is not entitled to a refund under the Act, and that it especially cannot make such decisions

---

[1] Mr. Friedrich made it clear at trial that Delaware Valley sold many cars during this same time period where it did not make a refund, because the individual customer did not insist upon one. Delaware Valley only made the refund when there was no other way to consummate a particular sale.

in a way which discriminates against non-franchised dealers.

We recognize that the Act may create some thorny questions regarding the discretion of the manufacturer. Since the manufacturer must first make a refund before it may submit a claim for reimbursement, it must at least preliminarily decide who is entitled to a refund under the Act. However, we believe that in this particular case, plaintiff's problems were of its own making, and we see no reason to pin the blame on General Motors.

We need not decide the difficult issue of whether these cars, allegedly new when sold to Delaware Valley's customers, qualified for excise tax reimbursements under the Act. First, Marvin Yentis and Jerry Friedrich testified at trial as to the "newness" of the cars in question. However, their testimony was in general terms and we find it difficult to believe that they had vivid recollections of the condition of each individual car's indicia of newness. Nor do we have any bases for believing the twenty-seven cars were not, in fact, factory-fresh.

Second, the procedure set up by the Act for making reimbursements is one contemplating knowledge by the manufacturer of the identity of the "ultimate purchaser" and may be inconsistent with a situation where, as here, a car may pass through several dealers' hands before it reaches the actual consumer. Although this may have been mere short-sightedness on the part of the drafters,

we will avoid such a determination since it is one unnecessary to our decision.

■ Very simply, plaintiff took a calculated course of conduct which proved to be wrong. The Act as eventually passed provides that the refunds to ultimate consumers are to be made by the manufacturer. The only role, if any, of the dealer is that of a conduit through whom the refund may be made, if the manufacturer elects to adopt that course,[2] a course not adopted by General Motors. The Act provides no machinery by which a dealer himself can apply for or make the refund.

Plaintiff has attempted to convince us that it was put at an unfair competitive disadvantage, and was forced to give credits for the excise tax after the President's announcement in order to stay in business. This argument is not persuasive.

First of all, the Act had not yet been passed at that time. Plaintiff could certainly do anything it wanted to after the President's speech on August 16 in order to improve or maintain its competitive position. If it wanted to give tax credits in order to sell cars, fine. But to expect that it would have a legally enforceable right against General Motors for such refunds, when the Act had only been recommended by the President, and did not in fact become law until months later, was not reasonable.[3] It is immaterial whether other automobile manufacturers were giving refunds after the President's speech.[4] It is equally imma-

2. "The reimbursement may be made directly by the manufacturer to the consumer or may be made through the dealer who originally sold the article." 1971 U.S.Code Cong. & Admin.News pp. 1918, 1992 (S.Rep., No. 92–437, 92nd Cong., 1st Sess.); see also § 142.2–2(c)(4), Temporary Excise Tax Regulations.

3. Congressional disregard of presidential recommendations is not unknown. Cf. the recent rejection by the Senate of the President's recommendation for increase of judicial salaries and Senator Mansfield's quoted statement that his "heart bleeds for the state of the U. S. judiciary." Phila.Inquirer, March 7, 1974.

4. At trial, plaintiff attempted to introduce certain advertisements into evidence to demonstrate differing representations made by other car manufacturers and dealers as to when and how refunds would be made. We sustained the objection to their admission on the grounds of relevance and informed counsel that if we reconsidered and found such information relevant when we came to write this opinion, we would allow plaintiff to reopen its case. As our opinion demonstrates, we continue to regard the actions taken by other dealers and manufacturers before the passage of the Act to be irrelevant to the issue of whether plaintiff has a valid claim against General Motors.

terial what General Motors dealers were doing, although in fact they were not making refunds at that time.[5] Unless the Act were to be passed, none of them could recover tax refunds from the United States Treasury.

Second, even if *an* Act were eventually passed, there was never any certainty that such an Act would apply to cars such as the twenty-seven in question sold by Delaware Valley. If it did not, perhaps plaintiff would be at a competitive disadvantage, but certainly not one for which General Motors would be liable. Thus, the only *reasonable* behavior for plaintiff, in order to protect itself, would have been to promise its customers that if the Act were enacted, and they were entitled to a refund under it, they would receive it in accordance with the Act's provisions. Any other approach, such as the one taken, may have allowed plaintiff to sell cars, but it put the burden of the risk of noncompliance with the Act squarely on plaintiff's shoulders. General Motors chose to make refunds directly to the consumer. In fact, it advertised right after the President's speech that this is what it would do. Plaintiff had no reason to make a refund itself and expect this court to order General Motors to reimburse it.

■ We disregard plaintiff's attempt to challenge the validity of the regulations, for we find that the regulations are irrelevant to actions taken by plaintiff before the passage of the Act. Had plaintiff waited to act until after the passage of the Act, and then failed to comply with the regulations as ultimately published, it would be on better ground to challenge their applicability.

This, of course, does not answer the question of whether plaintiff's customers were entitled to a refund of the excise tax from General Motors under the Act. This is a question we need not decide. Plaintiff's customers are not bringing this lawsuit. Nor have they any reason to, since plaintiff has already gratuitously paid them the amount of the excise tax. If one of plaintiff's customers were here today suing General Motors because he had not received a refund, we would have a different and more difficult case to decide.

### The Floor Stock Vehicles

Count II of plaintiff's complaint involves five unsold Cadillacs which plaintiff held in its inventory on December 11, 1971. Under the terms of the Act, any such new vehicles held for sale by the dealer on that date qualified for a refund of the federal excise tax. P.S. 92–178, § 401(b). To claim such a refund, it was not necessary for the manufacturer first to reimburse the dealer.[6] However, as with the vehicles already

5. Plaintiff's witnesses testified that they attempted to discover from General Motors and other dealers what procedure was to be followed after the President's speech, but that no one could or would tell them anything.

Irrelevant though it may be to our basis for decision, we do not find it entirely credible that plaintiff was able to purchase cars surreptitiously from General Motors franchised dealers who knew they were trading with a non-franchised dealer, and yet could not find out from one of them what refund procedure they were told to follow. And regardless of what General Motors dealers did or did not know, plaintiff was aware of the General Motors advertisement stating that in the event the Act was passed, General Motors would make reimbursements directly to the consumer. Furthermore, by Mr. Yen-

tis' own testimony, plaintiff never wrote General Motors about these twenty-seven vehicles until April 12, 1972. Nor did plaintiff call General Motors in Detroit during the period of initial confusion according to Mr. Yentis, although this was contradicted by Mr. Friedrich. Mr. Friedrich testified, however, that no one ever thought to contact the Internal Revenue Service.

6. Section 401(b)(1)(B) of the Act provides that a reimbursement must be made to the dealer on or before the first day of the tenth calendar month following the day after the date of the enactment of the Act unless "written consent has been obtained from the dealer to allowance of the credit or refund." The evidence establishes that such written consent was in fact obtained from plaintiff.

sold to ultimate purchasers, only the manufacturer could apply for the refund. After much coaxing by plaintiff, defendant filed a claim for refund on the five vehicles held by Delaware Valley, on October 2, 1972. To date, IRS has taken no action on that claim. Plaintiff argues that this claim was filed late and, therefore, defendant is responsible for plaintiff's not having received a refund from IRS.

■ The Act provides that a claim was to be filed before the first day of the tenth calendar month beginning after the day after the date of the enactment of the Act. That would have been September 30, 1972, which fell on a Saturday. Plaintiff argues that because the Act said "before" rather than "on or before", the rule allowing for filing on the first business day after the date specified in the statute when the specified date falls on a nonbusiness day is inapplicable.

However, the regulations interpreting the Act provide that "[e]ach claim for credit or refund under section 401(b) of the Act shall be filed on or before October 2, 1972." § 142.2–1(d)(1), Temporary Excise Tax Regulations. Plaintiff suggests that this regulation is invalid inasmuch as it contradicts the explicit language of the Act.

■ We think that the language of the Act is open to interpretation, and that such an interpretation is perfectly consistent with the statutory language. But it is not necessary for us to make that decision. Regardless of whether or not the regulation is consistent with the Act, there is no evidence that IRS failed to act on the claim filed on October 2, 1972 on the basis of untimeliness.[7] And without such evidence, plaintiff has not sustained its burden of proving that defendant, even assuming a duty, has prej-

udiced plaintiff. We therefore find for defendant on Count II.

The above constitutes our findings of fact and conclusions of law.

---

7. In fact, defendant's witness, Stewart Molyneaux, the manager of federal excise taxes and customs activities for General Motors Corporation, testified that General Motors filed four claims on October 2, two of which had already been paid by IRS at the time of trial.